Filed 2/25/22  P. v. Ervin CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B309740 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA090280) |
| v. | |
| FRANK ERVIN et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County.  James D. Otto, Judge.  Affirmed.

Matthew Alger, under appointment by the Court of Appeal for Defendant and Appellant Frank Ervin.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant Shawn Verrette.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendants and appellants Frank Ervin and Shawn Verrette are each serving a life sentence without the possibility of parole for the special circumstance murder and robbery of Franklin Robles. Defendants appeal from the orders denying their respective petitions for resentencing pursuant to Penal Code section 1170.95.

We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Ervin, Verrette and a third defendant, Luis Orozco, were charged with the 2010 special circumstance murder of Franklin Robles. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17); count 1.) They were also charged with robbery (§ 211; count 2), residential burglary (§ 459; count 3) and conspiracy to commit a crime (§ 182, subd. (a)(1); count 4). Various firearm use and prior conviction allegations were also alleged. (Orozco is not a party to this appeal but filed his own, separate appeal from the denial of his resentencing petition (*People v. Orozco* (Feb. 24, 2022, B306916) [nonpub. opn.]).)

The first joint trial of Ervin, Verrette and Orozco resulted in a mistrial due to juror misconduct.

The retrial proceeded in October 2015. During deliberations, the jury asked a question about how to proceed on the firearm use allegations if they were conflicted about whether Verrette or Ervin was the shooter. After further deliberations, the jury found all three defendants guilty of murder, robbery and conspiracy to commit a crime and found true the robbery murder special circumstance allegation. The jury found true the allegation a principal was armed in the commission of the offenses and also found true the allegation that Verrette personally used a firearm. However, they found not true the

2

allegation that Verrette personally discharged a firearm causing death. Defendants were acquitted on count 3, residential burglary. The prior conviction allegations were found true.

In December 2018, we affirmed defendants' convictions after modifying Ervin's and Verrette's respective sentences to reflect imposition of only one life term on count 1 and remanding for resentencing in light of the passage of Senate Bills 620 and 1393 (2017–2018 Reg. Sess.) during the pendency of that appeal. (*People v. Orozco* (Dec. 14, 2018, B276130) [nonpub. opn.].)

That same year, Senate Bill No. 1437 (2017–2018 Reg. Sess.) was passed, amending the law regarding felony murder and the natural and probable consequences doctrine. Senate Bill 1437 also added Penal Code section 1170.95 which sets forth a procedure whereby certain individuals, including those convicted of felony murder, could petition for sentencing relief. Section 1170.95 became effective January 1, 2019. (Stats. 2018, ch. 1015, § 4.)

On May 15, 2019, Ervin, with the assistance of counsel, filed a petition pursuant to Penal Code section 1170.95. Ervin said he had been convicted of felony murder and requested resentencing, attesting he was not the actual killer, did not act with intent to kill and was not a major participant in the shooting who acted with reckless disregard for human life. The People filed written opposition.

On October 27, 2020, defendant Verrette filed a form petition for resentencing, in propria persona. Verrette said he had been convicted of felony murder and requested resentencing. Verrette asked for counsel to be appointed and also attested he was not the actual killer, did not act with intent to kill and was not a major participant in the shooting who acted with reckless

3

disregard for human life. No written opposition was filed to Verrette's petition.

On November 2, 2020, the same judge who had presided over the 2015 retrial issued an order summarily denying both petitions. The court found that neither Verrette nor Ervin had demonstrated a prima facie case for relief. As to both defendants, the court reasoned that relief was not available as a matter of law because the "court file reflects" and the "Court of Appeal Affirmed" that each of them was "either the actual killer or was a major participant in the underlying felony and acted with reckless indifference to human life." The court also noted the jury had found true the felony murder special circumstance allegation.

Defendants appealed. Ervin requested we take judicial notice of portions of the record in the prior direct appeal, including the jury instructions, the closing arguments, the verdict forms and our 2018 opinion. We grant Ervin's request and take judicial notice of the record of conviction.

We recite the material facts from our 2018 opinion in which we affirmed defendants' convictions. (*People v. Orozco*, *supra*, B276130.)

"April P. was a small-time drug dealer who also helped her brother deliver and package methamphetamine. April's brother had been a major drug dealer in the Lake Elsinore area for over 20 years. In July 2010, he violated his probation and turned himself in to serve a 30-day sentence. April's brother intended for [Robles], another drug dealer and their childhood friend, to run his business while he served his sentence. Before he left, he gave [Robles] two cell phones and his remaining supply of methamphetamine. He asked April to help [Robles] run the

4

business until his return." (*People v. Orozco, supra,* B276130, fn. omitted.)

April described her relationship with Robles "as one of brother and sister." (*People v. Orozco, supra,* B276130.) During this time, Robles "was on parole, and he kept two homes. One, located on Franklin Avenue, was where [Robles] told his parole officer he lived. As a result, he usually did not keep any drugs or weapons in the Franklin house. The second or 'safe' house, located on Beachwood Avenue, was where [Robles's] girlfriend and their son lived. He kept a supply of drugs, money, and weapons at the Beachwood house." (*Ibid.*)

April was related by marriage to Orozco; her husband's brother was married to Orozco's sister. "April's brother supplied methamphetamine to Orozco, a member of the Compton Tortilla Flats gang known by the moniker 'Stalker.'" (*People v. Orozco, supra,* B276130.)

Orozco and Verrette were childhood friends. "Verrette was a member of the Looters Park Piru gang, who used the moniker 'Ace.' . . . Although they were members of rival gangs, [Verrette and Orozco] were allowed to maintain a relationship and Orozco was allowed in Looters Park territory without being harassed. He often visited Verrette at his home on San Marcos Street in Looters Park territory. Orozco was seen near Verrette's home a few days before [Robles's] murder." Defendant "Ervin was known as Casper and was also a member of the Looters Park Piru gang. He was a known associate of Verrette's." (*People v. Orozco, supra,* B276130.)

Robles "asked April to introduce him to Orozco. April arranged for the introduction at Orozco's house on August 3, 2010, and it appeared to go well. The next day, April and

[Robles] again met with Orozco in order to give him some drug samples. On their way back from the meeting, Orozco called [Robles] and asked if he knew anyone they could 'jack' to make quick money." (*People v. Orozco*, *supra,* B276130.) April testified the term "jack" meant to rob. Robles "replied he would work on it." (*Ibid.*)

"The following day, Orozco asked Robles again "whether he knew of someone they could rob. [Robles] suggested Jose, a drug dealer who supplied methamphetamine to April's brother. April overheard the conversation and objected, because she believed her brother would be upset about it. [Robles] assured her the drug dealer would not know he was involved because they would make it appear as if [Robles] was being robbed as well." (*People v. Orozco*, *supra,* B276130.)

"On August 6, April arranged for [Robles] to deliver another sample of methamphetamine to Orozco. At that meeting, Orozco asked [Robles] for an advance of the drugs and to allow him to pay for them later. [Robles] refused. Orozco was angry and asked April to intervene. April did, but with no success. Despite this disagreement, April believed they planned to go forward with the robbery." (*People v. Orozco*, *supra,* B276130.)

"Orozco and [Robles] arranged for the robbery to take place on August 9, just before Jose planned to leave for Texas with his family. The day before, April drove [Robles] to Jose's auto body shop in Long Beach so [Robles] could place an order for 10 pounds of methamphetamine. Jose confirmed it would be delivered the next day." (*People v. Orozco*, *supra,* B276130.)

On August 9, April drove to Robles's Franklin Avenue house to go with him to Jose's auto body shop. "She left her car there, and they drove [Robles's] car to Long Beach." (*People v.*

*Orozco, supra,* B276130.) April called Orozco and told him they were on the way. "When they arrived, they parked down the street from the auto body shop and [Robles] walked to the entrance to speak with one of the body shop's employees." (*Ibid.*) He took with him several cell phones and the remote gate opener to his home, among other items. After he got to the shop, Robles called April, "who was waiting in the parked car, [and told her] that Jose would be back in about 10 or 15 minutes and asked her to call Orozco to determine where he was. Orozco reported he was 'stuck at his home boy's house' and that he would be there in a few minutes." (*Ibid.*)

Robles told April to get something to eat. "As April prepared to leave, she noticed an older model, dark-colored van parked on the opposite side of the street with its nose towards the curb. It was dented and had a gray bumper. She also noticed two African-American men, later identified as Ervin and Verrette, trying to open the door to a neighboring business with a screwdriver. She watched them for a few seconds and then pulled out onto the street. She traveled to the end of the block and made a u-turn at the intersection. On her way back down the street, she observed that [Ervin and Verrette] were in the van and backing up towards the auto body shop, sideswiping a few cars along the way." (*People v. Orozco, supra*, B276130.)

April drove past Ervin and Verrette. Then, Robles "called to tell her to come back for some money. She went around the block to get back to the auto body shop, but as she approached, she saw [Robles's] shoes and his feet on the ground behind the gate of the auto body shop with no one around. April continued past the shop and onto the freeway, because [Robles] had told her

7

to leave if anything went wrong." (*People v. Orozco, supra,* B276130.)

"The employees of the auto body shop confirmed April's account. One of the employees said he recognized [Robles] and greeted him as he arrived. The employee then went to the back of the shop to speak with his coworker and call his boss, who told him to give [Robles] a car. When he returned to the front of the shop a few minutes later, he saw [Robles] lying face down on the ground with two African-American men standing over him, one of whom held a gun and was rifling through [Robles's] pockets while the other man held [Robles's] head." (*People v. Orozco, supra,* B276130.) The employee had some initial difficulty identifying Verrette from a photographic lineup but eventually identified Verrette as the man with the handgun. "The employee called his coworker over; the coworker saw the two men going through [Robles's] pockets. The employees also saw an older model purple van with holes made by a dent puller parked in the driveway of the auto body shop." (*Ibid.*)

"Upon seeing the employees, Verrette pulled what looked like a badge from around his neck and ordered, 'Get out. Police.' Both employees complied and went to the back office to hide. They did not believe the men were police officers, however. They were about to call 911 when they heard three gunshots in quick succession. They dropped the phone and hid. When they went back to the front of the shop a few minutes later, [Robles] was lying face up on the ground with three gunshots to his head. The employees called 911. [Robles] died shortly thereafter from his wounds. Forensic evidence showed the gun was a semiautomatic weapon, which was shot at close range. There were no defensive wounds." (*People v. Orozco, supra,* B276130.)

"Meanwhile, April called Orozco in a panic to tell him what she had seen and he directed her to meet him at a car wash near the freeway. He arrived in a tan Suburban approximately 30 minutes after she did. April immediately thought something was wrong because Orozco was wearing black gloves and a black hooded sweatshirt in 98 degree weather. Orozco told her he never made it to the auto body shop. He agreed to drive with her to ensure she got home safely. As they headed to Lake Elsinore, he instructed her to get off the freeway so they could get rid of [Robles's] car. April abandoned it on a residential street and got into the back of the Suburban, which had followed them. Orozco's best friend, also a member of the Compton Tortilla Flats gang, was driving." (The friend died in 2011.) (*People v. Orozco*, *supra,* B276130.)

Once in the Suburban, April recognized Ervin and Verrette as the two men she had just seen at the auto body shop. "Verrette sat in the front passenger seat. April sat between Ervin and Orozco in the back." (*People v. Orozco*, *supra,* B276130.)

"Ervin asked for April's cell phone and removed the battery, telling her he would return it to her later. He and Verrette broke down three other cell phones and threw the pieces out of the window. April asked Orozco what happened to [Robles] and he responded, 'he is not coming back.' At some point, Orozco also said, he was 'straight through that fool in sector 8.' To this, Verrette responded, 'Yeah, we did.' Orozco asked Verrette, 'are you cool, Ace?' Verrette put his hand back to high five Orozco." (*People v. Orozco*, *supra*, B276130.)

April told them her car was parked at Robles's house on Franklin Avenue. Once they got there, "Orozco opened the gate

with the remote that [Robles] had taken with him when he left April. Orozco unlocked the front door of the house and the men began to search it with socks on their hands. They eventually found money in a canister in the kitchen as well as a few laptops and other items. They took those things. Verrette used a towel to wipe away the Suburban's tire tracks from the driveway as they left." (*People v. Orozco*, *supra,* B276130.)

Verrette got into April's car and they followed the Suburban to Robles's other home on Beachwood. Somewhere close to the house, they stopped so Verrette and April could get into the Suburban and then continued on to Robles's house. "When they drove by the Beachwood house, they saw [Robles's] son playing outside. April warned Orozco that [Robles's] girlfriend would be in the house if her son was outside. He replied, 'I'm about to just go inside and crack that bitch up side the head and tie her up.' They drove by the house a few more times, but left without entering when a police car drove up behind them." (*People v. Orozco*, *supra,* B276130.)

"They returned to April's car, and Ervin gave her back her phone. . . . [April] asked [Orozco] again what happened to [Robles]. He shook his head and told her he was not coming back. Orozco instructed her to tell the police she did not know anything and to say that she was at home all day if they questioned her. He told her no one would find out what happened because the men with him had been doing this for a while and knew what they were doing. He also gave her $600 to buy a new cell phone. April saw Verrette, who was still in the Suburban, put his finger over his lips, which April understood as a message to her to keep quiet. April did not report the crimes to the police because she

feared for her own safety as well as her family's." (*People v. Orozco*, *supra,* B276130.)

Robles's "family suspected April was involved in his murder and gave the police her cell phone number.  April's cell phone records indicated she was in Long Beach and had contact with [Robles] on the day he was killed. . . .  They searched April's cell phone records, which led them to interview Orozco, his best friend, his daughter, and Ervin's former girlfriend, among others.  When she was first interviewed by the police, April denied any knowledge of the murder." (*People v. Orozco*, *supra,* B276130.)

"On October 7, 2010, April was arrested and charged with [Robles's] murder and robbery.  She was also found with nine grams of methamphetamine and charged with possession of narcotics.  The night before her arrest, Orozco's sister threatened her to keep quiet.  After her arrest, April admitted to the police that she dropped [Robles] off at the auto body shop and saw two African-American men in a van there, but refused to provide any other details about the murder." (*People v. Orozco*, *supra,* B276130.)

However, on February 5, 2011, April gave a recorded statement to the police "describing the events leading to [Robles's] murder.  She identified Orozco, Ervin, and Orozco's best friend from six-pack photographic lineups.  On March 14, she identified Verrette, who was not yet a suspect at the time, as 'Ace' from a photographic lineup.  She also identified the van she saw at the crime scene.  The same day, April entered into a plea agreement under which she pled guilty to robbery and agreed to testify at trial in exchange for three years in state prison.  Her account was corroborated by statements from the auto body shop employees and nearby surveillance video, which showed the car

she and [Robles] used that day driving in the area. In addition, her cell phone records showed her travelling" to locations during timeframes that correlated to the information she had provided to the police. (*People v. Orozco*, *supra,* B276130.)

"During the investigation, the police became aware of various telephone numbers the defendants had used. Cell phone records placed each of the defendant's cell phones near the auto body shop at the time of the murder, and the police were able to track their movements before and afterward." (*People v. Orozco*, *supra,* B276130.) Verrette's cell phone records showed it used a tower near the auto body shop on the morning of Frank's murder but was then turned off and its location later in the day could not be determined. "The police noticed a pattern of telephone calls on the day of the murder, which showed calls between April's cell phone and the cell phone numbers used by Orozco, his best friend, Verrette, and Ervin." (*Ibid.*)

In the course of their investigation, the police were able to link the distinctive van seen by April and the two auto body shop employees to Ervin. (*People v. Orozco*, *supra,* B276130.) Ervin's then-girlfriend owned the van and "testified that Ervin drove her van from approximately June 2010 to the end of December 2010. At some point after the murder, Ervin told his girlfriend not to drive the van in Long Beach or Compton, but did not explain why. Ervin told his daughter he stopped driving the van because he had gotten into trouble with some people he knew. Ervin changed his hairstyle after his sister told him the police came to her house asking about him." (*Ibid.*)

"In December 2010, Ervin's girlfriend saw him with a black handgun and argued with him about it. She testified it looked like a nine-millimeter semiautomatic gun. The cartridge casings,

bullet, and bullet jacket collected from the murder scene were determined to have been fired from a semiautomatic firearm." (*People v. Orozco*, *supra,* B276130.) Several months later, "Ervin brought a black nine millimeter-type semiautomatic handgun to his girlfriend's house. She hid it while he was taking a shower. He became angry when he could not find the gun and threatened his girlfriend with a fireplace poker, yelling, 'You stupid bitch. It's your fault that I killed that Mexican.' The next morning, Ervin's girlfriend went to the Long Beach Police Department and spoke to a detective investigating Robles's murder." (*Ibid.*)

"The police obtained wiretaps for various phone numbers they had reason to believe belonged to the suspects. To stimulate conversations for the wiretaps, the police put out bulletins and news reports with information about the murder, some of which were false. They also disseminated sketches of the suspects." (*People v. Orozco*, *supra,* B276130.)

In some of the calls, "defendants made references to [Robles's] murder and that they were apprehensive about the police investigation. In one, Orozco could be heard speaking in the background while Verrette was making a call to someone. He stated that his sister had told him to watch the news and that bulletins had come out about 'your murder case.'" (*People v. Orozco*, *supra,* B276130.) "Orozco's family frequently discussed the police bulletins and the investigation into [Robles's] murder." (*Ibid.*)

In calls "between August and October of 2011, Verrette often vented about the police investigation to Cameron M., his friend of more than 20 years. During these conversations, Verrette fretted about the sketches the police were passing out of the suspects to [Robles's] murder." (*People v. Orozco*, *supra,*

B276130.)  "Verrette told another friend he had changed his phone number, and would change it again, because the police could have used his number to find out who had been in contact with him.  Verrette also indicated he was lying 'lower than an ant with chucks on.'  He refused to go to Long Beach because '[t]hey been showing pictures of mutha fuckas and doing all kinds of shit.  I been seeing sketches and shit all kinds of shit over here.' " (*Ibid.*)

"On September 27, 2011, a Long Beach Police Department helicopter repeatedly flew low over the home Verrette shared with his grandmother. . . .  He complained about people coming to his house to specifically show him the police sketches.  After the helicopters flew over his house, Verrette was recorded telling a friend that because of an emergency, he may need to cut his hair and change his appearance." (*People v. Orozco, supra,* B276130.)

Richard Sanchez, a gang investigator with the Los Angeles County Sheriff's Department, testified as the prosecution's gang expert.  "Deputy Sanchez testified generally about gang culture and gang terminology.  He identified the different gangs located within Compton." (*People v. Orozco, supra,* B276130.)  Among other things, he testified "he had known both Orozco and Verrette since the 1990s.  He knew Verrette to have the street moniker 'Ace.'  He also understood Verrette was an 'O.G.,' known as an original gangster, or shot caller for the Looters Park Piru gang.  This meant that he had freedom to do things that a younger member of the gang would not." (*Ibid.*)  He testified Orozco was known as "Stalker" and was considered "a shot caller or 'O.G.' within the Compton Tortilla Flats.  Detective Sanchez further testified another gang investigator working in Compton told him Verrette and Orozco grew up in the same neighborhood

14

and were childhood friends.  As a result, they were allowed to maintain their friendship, despite their gangs' rivalry.  Detective Sanchez opined that no one would question two O.G. shot callers from rival gangs committing a crime together.  Moreover, the police might not think to investigate a gang member as an accomplice in a crime committed by a rival gang member." (*Ibid.*)

"Defendants did not testify.  Verrette's grandmother provided an alibi for him.  She testified Verrette had scheduled a colonoscopy on August 10 and that she was with him all day on August 9, the day of [Robles's] murder, to help him prepare for it.  She explained the doctor had ordered Verrette to drink a gallon of laxatives by 9:00 p.m. that day as well as complete a fleet enema.  She testified she was with him until 5:30 p.m., at which point his girlfriend picked him up.  The prosecution countered with testimony from a nurse who confirmed that a patient could begin to prepare for such a procedure as late as 7:00 or 7:30 p.m. the night before." (*People v. Orozco*, *supra*, B276130.)

## DISCUSSION

### 1. *People v. Lewis* (2021) 11 Cal.5th 952

The trial court summarily denied both petitions in November 2020, before the Supreme Court decided *People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*).

*Lewis* resolved several principles relevant here.

*Lewis* held it is error for a trial court to fail to appoint counsel to a defendant who has submitted a facially sufficient petition. (*Lewis*, *supra*, 11 Cal.5th at pp. 970, 972–973.)  But the failure to appoint counsel at this stage in the resentencing proceedings is state law error only, subject to harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818.  (*Lewis*, at pp. 973–974.)  *Lewis* further explained that "a petitioner 'whose

15

petition is denied before an order to show cause issues has the burden of showing "it is reasonably probable that if [he or she] had been afforded assistance of counsel his [or her] petition would not have been summarily denied without an evidentiary hearing." ' " (*Id.* at p. 974.)

*Lewis* also reaffirmed that appellate opinions are a part of the record of conviction, and held they are properly considered by the court in making a prima facie determination under Penal Code section 1170.95, subdivision (c). (*Lewis*, *supra*, 11 Cal.5th at p. 972.) However, *Lewis* cautioned the prima facie inquiry "is limited" (*id.* at p. 971) and that "the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' [Citation.] In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion' " (*id.* at p. 972).

But, where " 'the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis*, *supra*, 11 Cal.5th at p. 971.)

## 2. The Special Circumstance Finding

Both Verrette and Ervin argue the trial court erred in relying on the jury's true finding on the felony murder special circumstance allegation in denying relief, because the finding predated the Supreme Court's decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). The retrial here, in October 2015, occurred shortly after *Banks* was issued and several months before *Clark* was decided.

16

"*Banks* and *Clark* provided guidance for determining whether a defendant was a major participant (*Banks*) and exhibited a reckless indifference to human life (*Clark*), identifying several considerations, '[n]o one of [which] is necessary, nor is any one of them necessarily sufficient.' (*Banks, supra*, 61 Cal.4th at p. 803; see *Clark, supra*, 63 Cal.4th at p. 618.)" (*People v. Mejorado* (2022) 73 Cal.App.5th 562, 566 (*Mejorado*).)

There is split of authority among the Courts of Appeal as to whether a pre-*Banks* and pre-*Clark* felony murder special circumstance finding precludes a defendant from making a prima facie showing of eligibility for resentencing relief. (Compare *People v. Gomez* (2020) 52 Cal.App.5th 1, 17, review granted Oct. 14, 2020, S264033 [concluding that remedy for special circumstance is a petition for habeas corpus], with *People v. Smith* (2020) 49 Cal.App.5th 85, 94, review granted July 22, 2020, S262835 [concluding special circumstance finding is not a categorical bar to resentencing relief].) The Supreme Court is currently considering the issue. (*People v. Strong* (Dec. 18, 2020, C091162) [nonpub. opn.], review granted Mar. 10, 2021, S266606.)

As we recently said in *Mejorado*, pending guidance from the Supreme Court, we adopt the reasoning of *Smith* and the cases that have followed it and conclude that a felony murder special circumstance finding "is not a categorical bar to resentencing relief in every case as a matter of law." (*Mejorado, supra,* 73 Cal.App.5th at p. 571.)

The trial court here did not rely exclusively on the jury's true finding on the special circumstance allegation in denying defendants' petitions. The fact the court noted it as part of the

basis for its decision does not warrant a reversal as defendants seem to suggest. We must consider the balance of the court's orders denying relief to each defendant.

## 3. Defendant Verrette

Verrette contends the trial court committed error in denying his petition without appointing counsel and in making a factual determination at the prima facie stage. He further contends the court denied him due process by relying on our prior 2018 opinion which he contends contains errors with respect to the jury's findings on the firearm use allegations.

We agree the court committed error in failing to appoint counsel, but the error was harmless. (*Lewis*, *supra*, 11 Cal.5th at p. 974.) Verrette has failed to show that, if he had been appointed counsel, his petition would not have been summarily denied. The record of conviction contains facts refuting the allegations Verrette made in his petition. The facts establish his ineligibility as a matter of law. (*Id.* at p. 971; accord, *Mejorado*, *supra*, 73 Cal.App.5th at p. 572 [error in failing to appoint counsel is harmless "if we can determine that the record of conviction ' " ' contain[s] facts refuting the allegations made in the petition' " ' "].)

Under current law, in light of the amendments effected by Senate Bill 1437, felony murder liability may be imposed only if one of the following is proven, "(1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life." (Pen. Code, § 189, subd. (e);

18

see also *People v. Gentile* (2020) 10 Cal.5th 830, 842 & *Mejorado, supra*, 73 Cal.App.5th at p. 567.)

The facts and evidence described in our 2018 opinion demonstrate that Verrette was either the actual shooter, or aided and abetted Ervin in the shooting, or was a major participant who acted with reckless indifference to human life in the robbery and murder of Robles.

That the jury was unsure whether Verrette or Ervin was the one who pulled the trigger does not undermine the otherwise uncontroverted evidence that Robles was brutally shot three times in the head at close range, and that moments before the fatal shots were fired, Verrette was seen holding a handgun and standing over Robles while Ervin was holding him down on the ground. The record of conviction therefore unequivocally refutes the allegations in Verrette's petition and denial was therefore warranted.

As for Verrette's contention our 2018 opinion, upon which the trial court relied, erroneously described the jury findings on the firearm use allegations, it is not correct. The general statement in the opinion to which defendant eludes, that the firearm allegations as to count 1 were all found true, was clarified in that same paragraph with the statement that the allegations found true were that a principal used a firearm in the commission of the offenses and that Verrette personally used a firearm within the meaning of Penal Code section 12022.53, subdivision (b). There was no denial of due process.

## 4. Defendant Ervin

Ervin, who filed his petition with the assistance of counsel, contends the court committed error by making a factual determination at the prima facie stage and relying on facts not

19

contained in his petition.  He also argues the evidence in the record is insufficient to establish as a matter of law that he was the actual killer or a major participant who acted with reckless disregard under the law as amended by Senate Bill 1437.  We disagree.

As to first point, as we already explained above, *Lewis* held the record of conviction may be considered by the trial court in making a prima facie determination.

Ervin's contention the record fails to establish his ineligibility as a matter of law is also without merit.  Ervin contends there is no evidence he was the shooter.  He also suggests the only permissible inference from the record is that Robles was shot spontaneously when he unexpectedly resisted, and that any other inference is based purely on speculation.  This is a not an accurate characterization of the record.

As we already explained above, the jury may have been unsure whether Verrette or Ervin was the one who pulled the trigger, but the evidence is uncontroverted that both Ervin and Verrette were direct participants in the brutal shooting of Robles.  The witness testimony placed the gun in Verrette's hands, but the balance of the evidence demonstrates Ervin aided and abetted the shooting and was a major participant who acted with reckless indifference as defined under current law.

"Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' [Citation.]  Examples include ' . . . the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property.' [Citation.]  Reckless indifference 'encompasses a

willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.'" (*In re Scoggins* (2020) 9 Cal.5th 667, 676–677.)

The record of conviction refutes the allegations in Ervin's petition as a matter of law and denial was therefore warranted.

## DISPOSITION

The order denying defendant and appellant Frank Ervin's petition for resentencing is affirmed.

The order denying defendant and appellant Shawn Verrette's petition for resentencing is affirmed.

GRIMES, Acting P. J.

WE CONCUR:

WILEY, J.

HARUTUNIAN, J.*

---

*        Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.